**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 16-1004

MIDDLE EAST BROADCASTING NETWORKS, INC.,

Plaintiff - Appellee,

v.

MBI GLOBAL, LLC,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Gerald Bruce Lee, District Judge. (1:14−cv−01207−GBL−IDD)

Argued: January 25, 2017                                    Decided: May 2, 2017

Before WILKINSON, MOTZ, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion. Judge Diaz wrote the opinion, in which Judge Wilkinson and Judge Motz joined.

**ARGUED:** Michael Edward Tucci, STINSON LEONARD STREET LLP, Washington, D.C., for Appellant. Peter Christopher Grenier, GRENIER LAW GROUP PLLC, Washington, D.C., for Appellee. **ON BRIEF:** Christy M. Milliken, STINSON LEONARD STREET LLP, Washington, D.C., for Appellant.

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Circuit Judge:

MBI Global, LLC appeals the district court's judgment ordering the company to pay $701,536 to Middle East Broadcasting Network, Incorporated ("MEBN") as damages for breach of contract. Because we find no reversible error and agree that MBI is liable for the damages found by the district court, we affirm.

I.

A.

MBI Global is a Louisiana limited liability company that specializes in the production of blast-resistant buildings ("BRBs")—modular structures which the company builds in Shreveport, Louisiana and Ankara, Turkey. MEBN is a 501(c)(3) non-profit corporation, wholly funded by the United States Government, that provides Arabic-language news services throughout the Middle East and North Africa. The company is headquartered in Springfield, Virginia and has offices in, among other places, Baghdad, Iraq.

Beginning in 2004, MEBN's Baghdad studio and offices operated out of rental space at the Palestine Hotel. In 2012, seeking a more permanent home, MEBN moved its Baghdad offices to the Associated Press Building, but the new building lacked sufficient space for a television studio. MEBN then put out a "Request for Quote" for a "Baghdad Studio Protective Structure"—a "prefabricated studio [to be] delivered and installed at [MEBN's] office in Baghdad, Iraq." J.A. 593. MBI responded with a quote offering to build a BRB for $473,611 and install it in Baghdad for $37,000, for a total price of

2

$510,611 plus $23,700 in taxes and fees. On September 23, 2013, MEBN and MBI agreed to incorporate MBI's proposal as a contract titled "Purchase Order." Additionally, the parties' contract required that "delivery and installation be completed on or before December 31, 2013" and a down payment of $187,001, which MEBN paid. J.A. 599–600.

In mid-December 2013, MBI's subcontractor in charge of assembling the BRB had not even begun construction, and MBI informed MEBN that it needed an extension. MEBN and MBI agreed to the First Amendment to the Contract in January 2014 that (1) added a time of the essence clause, (2) changed the governing law from Louisiana to Virginia, and (3) extended the installation date to April 16, 2014 in exchange for a $100,000 credit against the contract purchase price. Around the same time as the First Amendment was agreed to, MEBN signed a temporary lease for studio space at the Crystal Palace Ishtar Hotel at a cost of $20,833 per month.

On April 10, 2014, MBI informed MEBN that it would not meet the April 16 deadline and would instead install the BRB before June 3. In June, MBI told MEBN that construction of the BRB was complete, but that delivery would be further delayed. MEBN responded with a "formal notice of cancellation" but, three weeks later, told MBI that it would accept delivery no later than August 3, 2014. J.A. 99. On July 16, 2014, MBI informed MEBN that delivery of the BRB was "not possible" due to the civil war in Iraq and that, unless MEBN chose to pick up the BRB in Turkey or some other location outside Iraq, MBI was putting the contract "on hold as a result of the force majeure." J.A. 116.

3

B.

MEBN filed suit on September 11, 2014, alleging breach of contract as of August 3. On October 16, MEBN contracted with Al Soor—a local Baghdad builder—to construct a brick-and-mortar television studio (the "Substitute Building") on a lot adjacent to the AP building and finish by December 15. MEBN paid Al Soor $175,541 for the Substitute Building, which was not completed until October 2015.

The BRB arrived in Baghdad in November 2014, but MBI did not attempt to install it and MEBN refused to accept it, having already filed suit against MBI and hired Al Soor to build a permanent studio. MBI then counter-claimed for breach of contract. After failed settlement negotiations, MEBN moved for summary judgment.

The district court granted summary judgment to MEBN on the issue of breach, finding no genuine dispute of material fact that MBI had breached the contract as of August 3, 2014. The court held that the force majeure clause was inapplicable because "the sole reason MBI failed to timely deliver the BRB [was] because it failed to pay a subcontractor, not because of any effects of a war." J.A. 294–95. Finally, the court rejected MEBN's claim for unjust enrichment because no such cause of action exists in Virginia in the face of an express contract. The court held a trial solely on the issue of damages. Ruling from the bench, the district court found MBI liable for $701,536.

This appeal followed.

4

II.

MBI raises five issues on appeal, all of which go to the issue of damages. First, MBI challenges two evidentiary decisions made by the district court: (1) to exclude communications between the parties' lawyers occurring after August 3, 2014; and (2) to admit evidence of damages incurred by MEBN after April 2015. MBI also contends that the district court erred in finding that: (1) ordinary contract principles, rather than the Uniform Commercial Code, governed the contract; (2) MEBN reasonably mitigated damages; and (3) MBI's breach was the proximate cause of MEBN's damages incurred after December 15, 2015.

At oral argument, MBI urged that if we hold that the district court erred on any of these counts, we should remand for a finding that MEBN is entitled to recover only $187,001—the down payment MEBN made for a blast-resistant building that it never received. Oral Arg. at 3:50–4:15. But because the district did not err, we affirm.

A.

We review decisions to admit or exclude evidence for abuse of discretion and "will only overturn an evidentiary ruling that is arbitrary and irrational." *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 239 (4th Cir. 2016) (quoting *Noel v. Artson*, 641 F.3d 580, 591 (4th Cir. 2011)).

1.

MEBN moved in limine to exclude communications between counsel that occurred after August 3, 2014—the date MBI breached the contract—pursuant to Federal Rule of Evidence 408. MBI did not dispute that the communications were settlement

negotiations, but argued that it wanted to use them "to show the effect the communication had on the listener" and specifically to attempt to prove waiver and estoppel—that is, for a purpose other than proving or disproving the validity or amount of a disputed claim. J.A. 284.

Federal Rule of Evidence 408 prohibits the introduction of "compromise offers and negotiations" as evidence to "prove or disprove the validity or amount of a disputed claim or to impeach." Courts, however, may admit such evidence "for another purpose," but are not required to do so. Fed. R. Evid. 408. As we have explained, courts "need not prevent a litigant from offering [settlement negotiation] evidence when [the litigant] does not seek to show the validity or invalidity of the compromised claim." *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 655 (4th Cir. 1988). That is, when a party seeks to introduce settlement negotiations as evidence for a purpose prohibited by Rule 408, courts are *required* to exclude the evidence, but when a party seeks to introduce the same evidence for a non-prohibited purpose, courts retain their discretion to admit or exclude the evidence.

MBI correctly argues that the district court here could have admitted the communications between the parties' counsel under Rule 408's exceptions. But the court here chose to exclude the communications under Rule 408, and we may reverse only upon a showing that the district court "act[ed] in an arbitrary manner, . . . fail[ed] to consider judicially-recognized factors limiting its discretion, or . . . relie[d] on erroneous factual or legal premises." *United States v. Henry*, 673 F.3d 285, 291 (4th Cir. 2012).

The district court granted MEBN's motion in limine because it did not agree with the substance of MBI's argument that the communications could prove waiver or estoppel. The district court did not act arbitrarily—it explained itself satisfactorily. There are no judicially recognized factors limiting the court's discretion in this context, and it did not rely on erroneous factual or legal premises. We therefore find no abuse of discretion and affirm the district court's decision to grant MEBN's motion in limine.

2.

MBI also objects to the admission of evidence of damages incurred by MEBN after April 2015 on the ground that MEBN failed to supplement its discovery disclosures with documents regarding Al Soor's construction efforts on the Substitute Building. Again, we review this evidentiary decision for an abuse of discretion.

Federal Rule of Civil Procedure 26(e) requires parties to supplement disclosure "if the party learns that in some material respect the disclosure or response is incomplete or incorrect." "If a party fails to provide information" as required by Rule 26, "the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

MBI claims that it believed the Substitute Building had been completed around April 18, 2015—as that is when MEBN indicated, when asked during discovery, that the building might be complete. In its Amended Complaint, however, MEBN tripled the amount of compensatory damages it sought, to reflect the fact that the company was still paying for space at the Ishtar Hotel while Al Soor finished the Substitute Building. MBI

7

subsequently filed a motion in limine to exclude all "evidence of consequential damages allegedly incurred in 2015."  J.A. 300.

Before the district court, MBI argued that MEBN "produced no documents [during discovery] describing the reasons for the four month delay" in Al Soor's construction and that, by failing to supplement its disclosures with documents regarding the delay after discovery concluded, MEBN violated Rule 26.  Mem. in Supp. of Def.'s Mot. in limine, ECF No. 75-1, at 2.  According to MEBN, however, "no such documents exist." Appellee's Br. at 25.  The district court never ruled on the motion in limine, and MEBN introduced evidence of damages occurring after April 2015 at trial without objection. MBI now asks us to hold that the district court should have barred this evidence.

Initially, MBI argues that the district court's failure to rule on the motion in limine was an abuse of discretion.  But we decline to reach this issue because MBI didn't object to the evidence at trial and therefore waived its objection, the earlier motion in limine notwithstanding.  *See* Fed. R. Evid. 103(a) ("A party may claim error in a ruling to admit or exclude evidence only if . . . a party . . . timely objects or moves to strike.").

MBI contends that because it moved in limine to exclude the evidence, "its objection was already clear," and therefore was not waived.  Appellant's Reply Br. at 23. We have held that, when a party at trial earlier objected to evidence on specific grounds but later objects generally, the "ground for objection [can be] clear to everyone" and satisfy Rule 103's requirement that an objecting party state the specific ground for objection.  *Werner v. Upjohn Co.*, 628 F.2d 848, 853 (4th Cir. 1980).  But Rule 103 specifically envisions this leniency: A party need not state the specific ground for

8

objection if "it was apparent from the context." Fed. R. Evid. 103(a)(1)(B). The requirement that a party "timely objects or moves to strike," however, contains no such carveout, and we decline to hold here that an objection may be so clear or obvious that a party need not even voice it.

Given MBI's waiver of the evidentiary issue, "our review is restricted to plain error." *United States v. Keita*, 742 F.3d 184, 189 (4th Cir. 2014). Accordingly, MBI must show that "there was an error, the error was plain, and the error affected [its] substantial rights." *Id.* (quoting *United States v. Boykin*, 669 F.3d 467, 470 (4th Cir. 2011)). We do not plainly see that MEBN violated Rule 26. The company continues to claim no documents exist relating to Al Soor's delays. And even if such documents did exist, MBI fails to show how or why it was harmed by non-disclosure.

B.

MBI does not challenge the district court's finding that it breached the contract but argues that, even admitting evidence of damages MEBN incurred in 2015 and excluding communications between the parties' attorneys, the district court erred in awarding $701,536 to MEBN. Appellant asks us to reverse the district court's judgment on the grounds that the court erred in finding that: (1) the contract was not governed by the Uniform Commercial Code (and therefore incorrectly applied a common-law formula for damages); (2) MBI's breach was the proximate cause of damages incurred by MEBN after December 15, 2014; and (3) MEBN reasonably mitigated its damages.

We review the district court's findings of fact for clear error, but "to the extent those [findings] were influenced by legal error, review is de novo." *Universal Furniture*

9

*Int'l, Inc. v. Collezione Europa USA, Inc.*, 618 F.3d 417, 427 (4th Cir. 2010) (internal quotation marks omitted).

1.

Virginia law governs the parties' agreement. Virginia has adopted the Uniform Commercial Code ("UCC"), which governs contracts for the sale of "goods"—"all things (including specially manufactured goods) which are movable"—but not contracts for realty or services. Va. Code Ann. § 8.2-105. But because the contract here included the purchase of a metal box (a good) to be used as a TV studio on a specific parcel (realty) along with its transportation and installation (services), it is not readily clear whether the UCC governs.

In such cases of "mixed" contracts, we determine whether the "predominant factor" is "the rendition of service, with goods incidentally involved . . . or . . . [if] labor [is] incidentally involved." *Princess Cruises, Inc. v. Gen. Elec. Co.*, 143 F.3d 828, 833 (4th Cir. 1998) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)). The district court found that the contract here

> does not contemplate a sale[] of goods. It contemplates delivery of a TV studio, a building, that is, a modular structure that has permanent features, including a concrete slab, installation of electrical and other items to make it a TV studio . . . . [A]nd therefore the UCC does not apply.

J.A. 566.

A determination as to whether a contract is governed by the UCC is "a factual one subject to review only under a clearly erroneous standard." *Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 778 F.2d 196, 198 (4th Cir. 1985). We, however, find it

10

unnecessary to decide whether the district court erred in holding that the contract was not for goods because this issue is immaterial to the substance of MBI's appeal: The company is liable for the same amount in damages whether we apply Virginia common law or the UCC.

Under Virginia common law—which the district court applied here when calculating damages—"direct (or general) damages . . . are those which arise 'naturally' or 'ordinarily' from a breach of contract; they are damages which, in the ordinary course of human experience, can be expected to result from a breach." *Roanoke Hosp. Ass'n v. Doyle & Russell, Inc.*, 214 S.E.2d 155, 160 (Va. 1975). The UCC, in contrast, allows a buyer who has suffered breach to "cover" (purchase "goods in substitution for those due from the seller")—as MEBN did with Al Soor's Substitute Building here—and then recover from the seller "the difference between the cost of cover and the contract price . . . less expenses saved in consequence of the seller's breach." Va. Code Ann. § 8.2-712; *see also id.* § 8.2-711.

Because the contract price here was $534,311 and the cover only $175,541, MEBN would not be entitled to cover damages under the UCC. The UCC also allows a buyer to "recover[] so much of the price as has been paid." *Id.* § 8.2-711(1). Here, MEBN made a down payment of $187,001, and MBI does not dispute that it owes MEBN that sum.

But here the differences between the UCC and the common law end. The UCC allows victims of breach to recover for consequential damages, which are "any loss resulting from general or particular requirements and needs of which the seller at the time

11

of contracting had reason to know and which could not reasonably be prevented by cover." *Id.* § 8.2-715(2)(a). Virginia common law too allows for consequential damages and, like the UCC, requires the breaching party to have had reason to know the damages would be incurred. *Roanoke Hosp.*, 214 S.E.2d at 160 (defining common-law consequential damages as "those which arise from the intervention of 'special circumstances' not ordinarily predictable" but "compensable only if it is determined that the special circumstances were within the 'contemplation' of both contracting parties"). As a result, it doesn't matter whether the district court applied the UCC or Virginia common law so long as it found that MBI contemplated MEBN's ongoing damages until a permanent studio was built.

"'Contemplation,' in this context, includes both circumstances that are actually foreseen and those that are reasonably foreseeable." *Long v. Abbruzzetti*, 487 S.E.2d 217, 219 (Va. 1997). We examine the parties' "contemplation . . . at the time the contract was made," and "whether special circumstances were within the contemplation of the parties is a question of fact." *Id.*

The district court found that MBI actually foresaw MEBN's continued costs for temporary studio space. MBI acknowledged that the $100,000 credit it offered to MEBN as part of the January 2014 First Amendment was meant in part to offset the costs of continuing to rent space at the Ishtar Hotel until the BRB's then-anticipated April 2014 delivery date. MBI even offered MEBN free use of another building in Baghdad (which turned out to be unsatisfactory), underscoring MBI's understanding that MEBN would continue to require studio space as a result of MBI's failure to deliver the BRB. Based on

12

this evidence, we see no reason to upend the district court's finding that MBI actually foresaw MEBN's damages.[1]

MBI argues that the district court nonetheless erred by looking to January 2014—the date of the First Amendment to the contract—rather than July 2014—the date of the final modifications of the contract—for evidence of what the company contemplated at the time of contracting. We must indeed determine the parties' state of mind in July to resolve whether MBI contemplated damages incurred by MEBN thereafter, but it defies logic to ignore what MBI knew earlier in the year.

Given that MBI knew in January 2014 that MEBN would continue to incur rental expenses until a permanent studio was built—and indeed conceded as much by offering a credit to offset MEBN's rent payments at the Ishtar Hotel—MBI certainly knew in July 2014 that MEBN would continue to incur rental expenses until a permanent studio was built.[2] The district court therefore did not err in it analysis.

---

[1] It is immaterial that the district court found MEBN's rental costs to be direct damages, therefore rendering its own foreseeability-of-consequential-damages analysis beside the point. The district court found that the damages "were actually foreseen . . . [as] a consequence of the breach," and we affirm that finding. J.A. 569. Similarly, MEBN argued at trial that the court should find, as "direct damages . . . what was in the contemplation of the parties at the time of contracting." J.A. 353.

[2] MBI's witnesses testified that, as of May and June 2014, they were unaware that MEBN was continuing to incur costs as a result of MBI's failure to deliver the BRB. But the district court chose not to credit this testimony, and we may not reweigh the evidence or credit witnesses that the trial judge did not. *Anderson v. City of Bessemer*, 470 U.S. 564, 574–76 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

2.

MBI also disputes the district court's finding that MEBN reasonably mitigated its damages. Because we agree with the district court's assessment that hiring Al Soor to construct the Substitute Building was reasonable mitigation and reject MBI's contention that it would have been *more* reasonable for MEBN to simply wait for installation of the BRB, we will not reverse on this ground.

A party asserting a claim of breach of contract has a duty to mitigate damages and may not recover for additional costs incurred absent "ordinary efforts and reasonable expenditure to minimize consequential damages." *In re Fairfax W. Apartment Owners Ass'n, Inc.*, 1991 WL 76035, at *2 (4th Cir. May 14, 1991). Failure to mitigate is an affirmative defense, and the burden is on the defendant to prove that the plaintiff failed to mitigate. *Foreman v. E. Caligari & Co.*, 130 S.E.2d 447, 451 (Va. 1963).

After MBI breached the contract by failing to install the BRB by August 3, 2014, MEBN hired Al Soor to construct the Substitute Building to mitigate the continuing cost of renting space from the Ishtar Hotel and to realize its ultimate goal of having permanent studio space in Baghdad. MEBN contracted with Al Soor on or about October 16. Several weeks after MEBN hired Al Soor, the BRB arrived in Baghdad. The district court found that MEBN acted reasonably in its efforts to mitigate damages by "vetting a contractor [and] identif[ying] Al Soor Engineering Company as a vetted, reputable contractor in Baghdad[] that had built other buildings for expatriates and other foreign governments." J.A. 571.

14

MBI contends that it was unreasonable for MEBN, after the BRB arrived in Baghdad, to not terminate its contract with Al Soor and rekindle its relationship with MBI. In essence, MBI asks us to hold that MEBN could have mitigated more effectively. This argument fails.

Non-breaching parties are only held to a "reasonableness" standard, and a defendant alleging that a plaintiff acted unreasonably in its mitigation efforts must show that the plaintiff enjoyed a windfall "special benefit" by acting as it did. *See* Restatement (Second) of Contracts § 350(2) (1981) ("The injured party is not precluded from recovery . . . to the extent that he has made reasonable but unsuccessful efforts to avoid loss."); *cf. Lee v. Bell*, 379 S.E.2d 464, 467 (Va. 1989) (citing to contract cases placing the burden of proof as to mitigation of damages on a defendant and holding, in a tort action, that "if a special benefit is conferred upon a plaintiff by a defendant's tortious act, evidence of that benefit may be considered by the jury in mitigation of damages").

Here, as the district court found, MEBN did not enjoy a windfall or special benefit by hiring Al Soor—indeed the Substitute Building was $258,770 cheaper than the BRB, even after the $100,000 credit, and it offers less protection than the BRB. We agree with the district court that MBI failed to establish the unreasonableness of MEBN's choice of mitigation.

3.

Finally, MBI takes issue with the district court's finding that its breach was the proximate cause of MEBN's damages even after Al Soor delayed construction of the Substitute Building. This argument too fails.

15

Damages for breach of contract "must be consequent upon a breach of the contract. If they are so remote as not to be directly traceable to that breach, or are attributable to some other intervening cause, then they cannot be allowed." *Manss-Owens Co. v. H.S. Owens & Son*, 105 S.E. 543, 549 (Va. 1921); *see also Exxon Co., U.S.A. v. Sofec, Inc.,* 517 U.S. 830, 838–40 (1996) (explaining the important but limited role of proximate-cause analysis in contracts cases).

If a third party intervenes, the chain of proximate cause may be broken, but "not every intervening cause is a superceding cause." *Coleman v. Blankenship Oil Corp.*, 267 S.E.2d 143, 147 (Va. 1980). Additionally, an "intervening cause is not a superseding cause if it was 'put into operation by the defendant's wrongful act [or] omission.'" *Id.* (quoting *Jefferson Hosp., Inc. v. Van Lear*, 41 S.E.2d 441, 444 (Va. 1947)). Rather, the intervening cause "must so entirely supersede the operation of the defendant's [breach] that it alone, without the defendant's [breach] contributing thereto in the slightest degree, produces the injury." *Id.* (quoting *City of Richmond v. Gay*, 49 S.E. 482, 483 (Va. 1905)). "The issues of proximate causation and superseding cause involve application of law to fact, which is left to the factfinder, subject to limited review." *Exxon*, 517 U.S. at 840–41 (The appellant must make an "obvious and exceptional showing of error." (internal quotation marks omitted)).

We acknowledge that MBI was not to blame for Al Soor's delays in finishing the Substitute Building. But the district court refused to find that Al Soor's own breach "entirely superseded" MBI's failure to install the BRB. Instead, the court credited MBI's evidence that Al Soor was "building in a war zone . . . [and] trying to find a building that

16

had the proper security . . . [for Baghdad's] Green Zone," concluding that "the fact that [Al Soor] took longer is of no moment." J.A. 572. MBI's argument that its lack of involvement in MEBN's choice to hire Al Soor or Al Soor's delays is relevant to the proximate cause analysis has no foundation in Virginia law. We find no "obvious and exceptional" error in the district court's holding that Al Soor and MEBN's actions did not rise to the extraordinary level of a superseding cause.

## III.

For the reasons given, we affirm the district court's judgment.

*AFFIRMED*